IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SOUNDVISION TECHNOLOGIES, LLC, a Utah limited liability company, doing business as TRUAUDIO, | |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| vs. | |
| TEMPLETON GROUP LTD, a Nevada corporation, | Case No. 2:09-CV-870 TS |
| Defendant. | (consolidated with Case No. 2:10-CV-1208 TS) |
| TEMPLETON GROUP LTD., | |
| Counterclaimant, | |
| vs. | |
| SOUNDVISION TECHNOLOGIES, LLC, | |
| Counterclaim Defendant, | |

TEMPLETON GROUP LTD.,

     Plaintiff,

        vs.

KAI SHUAI INDUSTRIAL CO. LTD.,

     Defendant.

 

This matter is before the Court on the following three Motions for Summary Judgment: (1) Defendant/Counterclaim Plaintiff Kai Shuai Industrial's Motion for Summary Judgment; (2) Plaintiff/Counterclaim Defendant Soundvision Technologies' Motion for Summary Judgment; and (3) Defendant/Counterclaim Plaintiff/Consolidated Plaintiff Templeton Group's Motion for Summary Judgment.

## I.  FACTUAL BACKGROUND

### A.    THE PARTIES

TruAudio is a Utah company that develops and sells speakers and related audio products to distributors and dealers.  Although TruAudio designs and sells its branded products, it outsources the manufacturing of these products to factories located in China.  Historically, instead of working directly with the Chinese factories, TruAudio has relied on third party vendors to communicate with the factories and get product shipped to TruAudio.

Kai Shuai is a Taiwan company that owns one of the Chinese factories that produces TruAudio's products.  Before this factory, known as Yung Tong, is able to manufacture products for TruAudio, it must first build tooling that will enable the mass production of the products. Yung Tong has two relevant types of tooling: (1) open tooling, or generic tools, that the factory can use to create and sell product to anybody; and (2) tooling owned by a customer that may only be used to manufacture product for that customer.

Templeton is a Nevada corporation with its principal place of business in California. Templeton is a company founded by Chris Swan that works directly with factories in China to help TruAudio and other United States companies outsource their production.  Prior to starting Templeton, Mr. Swan worked for and co-owned a company called Audio Technologies Incorporated (hereinafter "ATI").  While Mr. Swan was at ATI he developed a relationship with one of ATI's customers, TruAudio.  After several years, Mr. Swan decided to leave ATI to start Templeton.  In December of 2006, TruAudio elected to keep its business with Mr. Swan, and informed both ATI and Templeton that it would use Templeton to supply its current and developing products.

B.     TEMPLETON'S SERVICES

Although the extent of Templeton's services are disputed in this case, the company not only communicates and negotiates with the Chinese factories, it also provides design services to assist the United States companies.  From numerous emails provided to the Court, it is clear that TruAudio had Templeton help turn product ideas into workable designs.  At times, TruAudio

provided Templeton with rough sketches, models, or ideas for product modifications and had

Templeton either create a design to take to the Chinese factories or work directly with the

factories to make the changes.[1]  At times, TruAudio would request that Mr. Swan create a design

for various products.[2]

          According to TruAudio's president, Brent Howard, Templeton handled most of the

communication with the Chinese factories during the time Templeton was TruAudio's vendor.[3]

In his deposition, Mr. Howard further described the services provided by Mr. Swan and

Templeton as follows:

> Q: (counsel) How did the factory know what TruAudio wanted?
> A: (Mr. Howard) Usually from whatever we supplied them.  I mean . . . we would
> just send them, you know, give them the information the best we could through
> drawings, hand drawings; literally hand drawings and specs, that kind of stuff.
> Q: Is that a stage that you worked with Templeton on?
> A: Yes, sometimes.[4]
>                                        ***
> Q: Okay.  On the Ghost Series, was Chris Swan, Templeton, involved in what you
> identified to me was the fifth step of making, getting the mechanical drawings
> from the factory?
> A: Yeah.
> Q: Was he involved in getting the quotes from the factory?
> A: Yeah.
> Q: Was he involved in doing the mockup sample from the factory?
> A: Yeah, I believe so.
> Q: Was Templeton involved in working between TruAudio and the factory during
> the evaluation of the mockup sample?
> A: Well, they shipped it to us and then we tested it.

---

[1]*See* Docket No. 69 Exs. 1-8, 10-12, 15-16, 25-26.

[2]*Id.* Exs. 2, 6.

[3]Docket No. 55 Ex. 5, at 108.

[4]*Id.* at 39-40.

Q: Right.  And if you had any modifications as far as the looks?
A: Yeah.  Because he was – yes.
Q: Then if you had any modifications in regard to the functionality, would you communicate that to Templeton?
A: Yeah, I would.
Q: And Templeton would cause, work with the factory to get those things fixed?
A: Um-hmm.
Q: Okay.  And then was Templeton involved in negotiating a price from this factory for you?
A: Yes.[5]

\*\*\*

Q: Following up on the warranty problems.  If problems were identified either in pre-production or mass production?
A: Yes, we would have to go to Chris.  And he would, obviously, have to go to the factory with it.[6]

\*\*\*

Q: I guess I'm confused.  It sounds like you are telling me now that Chris or Templeton didn't really add any value for you.  Is that what you are telling me?
A: No, I'm not saying that he didn't add no value.
Q: Okay.  He contributed something?
A: Yes.[7]

C.     PAYMENT

During the course of their relationship, TruAudio never paid Templeton a flat fee or an hourly rate for the services it provided.  Instead, Templeton would pay the factories for the products, add a markup, and then resell the products to TruAudio.  The price TruAudio paid was negotiated between Templeton and TruAudio before TruAudio ordered the products.  In the event a product never made it into mass production, Templeton would not receive any compensation for its work on that product.  However, when a product did make it into mass

---

[5]*Id.* at 43-44.

[6]*Id.* at 52-53.

[7]*Id.* at 46.

production, Templeton's practice was to continue charging a markup until TruAudio would "sunset," or cease production of, the product.

Other than purchase orders for individual shipments of product, Templeton and TruAudio never signed formal documents describing the details of their relationship. Consequently, there is no written agreement covering the termination of the relationship between Templeton and TruAudio. Nor is there any written agreement describing how, or if, Templeton should be compensated for products it assisted TruAudio in developing, but that TruAudio decided to purchase from the factories either directly or through a vendor other than Templeton.

When Mr. Swan left ATI to start Templeton, some customers for whom he had performed work stayed with ATI, and some, like TruAudio, followed him to Templeton. Mr. Swan's prior co-owner at ATI, Mr. Melillo, testified that following the split, ATI customers were not required to compensate Templeton for future purchase orders of product on which Mr. Swan had performed work.[8] Likewise, TruAudio was not required to compensate ATI for any new purchase orders made between TruAudio and Templeton for product that was developed when TruAudio was purchasing from ATI.[9]

Mr. Melillo further testified that there was nothing to prevent TruAudio from taking its business for a specific product to a new supplier, unless there was a "firm, hard contract,"[10] or, in other words, "a contract that says that – that product is going to be delivered exclusively by that –

---

[8]Docket No. 55 Ex. 3, at 83-85.

[9]*Id.*

[10]Docket No. 67 Ex. A, at 20.

6

by that company to TruAudio."[11]  Finally, Mr. Melillo testified that it was his understanding that, at least while TruAudio worked with ATI,  TruAudio had the right to change suppliers of its products.[12]

## D.      THE SPLIT WITH TEMPLETON

Although the parties dispute the degree of work performed by Templeton, from December of 2006 until April of 2009, Templeton helped TruAudio develop a new product, the "X" series, redesign an existing series, the "Revolve" series, and develop several models within the "Ghost" series.  Although it was Templeton that worked with Kai Shuai's Yong Tong factory to develop tooling for and produce these products, Kai Shuai knew that the products were ultimately going to TruAudio.[13]

In fact, in September of 2008, a Yong Tong employee sent TruAudio an email, stating that they "sincerely want to take these models and we have confidence to handle these projects very well and want to do the business with [TruAudio] directly to shorten the communication time and lessen some misunderstanding.  Please kindly help to check if we have such honor to work for [TruAudio] directly."[14]  In addition to this email, Mr. Howard testified that he had

---

[11]*Id.*

[12]*Id.* at 20-21.

[13]Docket No. 55 Ex. 2, at 9.

[14]*Id.* Ex. 12.

received solicitations from Kai Shuai to work directly with the Yong Tong factory prior to

2008.[15]

Around April of 2009, a Yong Tong employee provided its price list for TruAudio

products to ODM, a United States engineering company that worked with TruAudio.  ODM, in

turn, provided this price list to TruAudio, revealing to TruAudio the prices that Templeton was

being charged for TruAudio's products.  Kai Shuai's representative, Ms. Hui-Chuan Lee,

testified as follows concerning the decision to provide the price list to ODM:

> A: (Ms. Lee) Are you asking did Kai Shuai provide ODM with the price list that
> will be charged to the Templeton Group?
> Q: (Counsel) Yes
> A: I think we did have that, but that was under the impression – understanding
> that TruAudio already ceased the order or relationship between [Templeton].
> That's when they were looking for some other vendor.  That's when the request –
> ODM requested Kai Shuai to supply what was the price list to when they were
> doing business with [Templeton].[16]
> ***
> Q: Did [the Yong Tong employee] transmit the price list to ODM so that Kai
> Shuai could start working directly with TruAudio?
> A: We don't have any – we don't have a hundred percent guarantee from
> TruAudio.  We don't know if TruAudio will give us the opportunity to do this
> business.  TruAudio has many other choices, too, and we don't know if we can get
> the bid.[17]
> ***
> Q: I understand it is up to TruAudio to decide, but the question is whether Kai
> Shuai wanted the business when the price list was provided .
> A: If we don't provide the price list, we will not have any chance to compete.
> Q: Do you know what ODM did with the price list?

---

[15]*Id.* Ex. 5, at 76.

[16]*Id.* Ex. 2, at 12-13.

[17]*Id.* at 13.

A: I think TruAudio also working for ODM.  They may have some other – they might think – she might think that TruAudio may want to have some direct connection with ODM or any other contract, but I have no idea on that.[18]

Mr. Howard testified that Mr. Swan had told him several times that Templeton's markup was about 15 percent.[19]  The CEO and owner of TruAudio, Ronald Davies, also testified that Mr. Swan had told him that Templeton's markup was 15-20 percent, "if that."[20]  Additionally, Mr. Davies testified about one specific time in early 2009 when he asked Mr. Swan about his margins, stating that "I got a similar response.  But this time, the body language and the facial expression told me he was lying. . . .  So, as soon as he left I went back into their office and I said, Templeton's out of here.  We need to find out how much they are charging us."[21]  Mr. Swan, on the other hand, testified that he was never asked about the margins Templeton was adding to the products it was selling to TruAudio.[22]  Once Mr. Davies saw the price list, he learned that Templeton's markup ranged from 20 percent to 72 percent.[23]

On April 3, 2009, TruAudio sent a termination letter to Templeton, severing the relationship and cancelling three purchase orders.[24]  In its cancellation letter, TruAudio explained

---

[18]*Id.* at 14.

[19]Docket No. 67 Ex. C, at 45.

[20]*Id.* Ex. B, at 14-15.

[21]*Id.* at 15.

[22]*Id.* Ex. H, at 118.

[23]*Id.* Ex. B, at 69.

[24]Docket No. 55 Ex. 7.

that it could no longer pay the costs added by third party vendors, and that it would be working directly with the Chinese factories in the future.[25]  Although TruAudio began purchasing its products directly from Kai Shuai instead of through Templeton, it continued to purchase products that Templeton helped it develop.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[26]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[27]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[28]  In opposing a motion for summary judgment, "[t]he nonmoving party 'may not rest upon the mere allegations or denials of his pleadings' to avoid summary judgment."[29]

---

[25]*Id.*

[26]Fed. R. Civ. P. 56(a).

[27]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[28]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

[29]*Baccus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Anderson*, 477 U.S. at 248).

III.  DISCUSSION

As a preliminary matter, it must be noted that, although Kai Shuai appears to be moving for summary judgment on all of Templeton's claims against it, it only makes this Motion in a conclusory manner, "invoking the reasoning of TruAudio's Motion for Summary Judgment to the extent applicable."[30]  As DUCivR 56-1 and DUCivR 7-1 require a party to set forth the grounds of the judgement sought and cite the applicable authority for the relief sought, the Court will deny Kai Shuai's Motion for Summary Judgment on any of Templeton's claims.  However, as Kai Shuai has fully briefed its Motion with regard to its own claims against Templeton, the Court will consider those claims.  Because the Court is sitting in diversity jurisdiction, it will apply the substantive law of the State of Utah unless it indicates otherwise.[31]

A.      KAI SHUAI'S CLAIM FOR CONTRACTUAL PAYMENT

1.      *Facts Specific to Kai Shuai's Claim*

Both Kai Shuai and Templeton request summary judgment on Kai Shuai's claims for payment on past-due invoices.

Immediately after TruAudio terminated its relationship with Templeton and cancelled three open purchase orders,[32] Templeton cancelled its corresponding purchase orders with Kai Shuai.[33]  TruAudio then issued replacement purchase orders directly to Kai Shuai.  When

---

[30]Docket No. 51, at 2.

[31]*MediaNews Grp., Inc. v. McCarthey*, 494 F.3d 1254, 1260 (10th Cir. 2007) (citing *Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145 (10th Cir. 2003)).

[32]TruAudio Purchase Order Nos. 1089, 1092, and 1105.

[33]Templeton Purchase Order Nos. 9000, 9002, and 9006.

Templeton cancelled its purchase orders, only a small portion of one of the purchase orders had already been shipped.[34]  Kai Shuai issued a March 12, 2009 invoice to Templeton seeking $1,289.75 in payment for the item shipped pursuant to the purchase order that was later cancelled.[35]  Kai Shuai is not seeking payment on any portions of the cancelled purchase orders that had not been performed prior to cancellation.

In addition, Kai Shuai has not received payment for product that was provided pursuant to Templeton purchase orders that were not cancelled.[36]  The remaining unpaid portions of the March 12, 2009 invoice total $52,448.30.[37]  Templeton has not disputed that this product was delivered to and accepted by TruAudio pursuant to the relevant purchase orders.

Finally, Kai Shuai has not received payment for tooling it provided for TruAudio's Revolve product line.  Kai Shuai invoiced Templeton for the tooling on October 19, 2007.[38] Pursuant to the agreement, one-third of the payment was due upon approval of the parts, one-third was due six months after production launch, and one-third was due after one year.[39]  The initial payment was made, but subsequent payment was not, and $25,656.67 remains due.[40]  On

---

[34]*See* Docket No. 58, at 1; Docket No. 69 Ex. 60, at 4.

[35]*Templeton Grp. v. Kai Shuai Indus.*, Case No. 2:10-cv-1208, Docket No. 7 Ex. B.

[36]*See id.*

[37]*Id.*

[38]*Id.* Ex. A.

[39]*Id.*; Docket No. 69, Ex. 56.

[40]*Templeton Grp. v. Kai Shuai Indus.*, Case No. 2:10-cv-1208, Docket No. 7 Ex. A; Docket No. 52 Ex. C, at 21.

March 11, 2009, Kai Shuai issued an additional invoice for tooling modifications for $120.[41]  The

total amount claimed by Kai Shuai is $79,514.72.

Mr. Swan testified as follows in his deposition:

Q: (Counsel) Are you claiming that you don't owe any of that amount to Kai Shuai?
A: (Mr. Swan) I'm claiming, I think, yes. . . .  Yeah.  Yeah.  I am.  Absolutely.
Q: Okay.  And subject to verification of the exact amount, though, you do acknowledge that Templeton Group placed an order with Kai Shuai for that tooling?
A: Yes, we did.
Q: And you don't dispute the amount that Kai Shuai billed for that tooling, do you?
A: No.
Q: Okay.  So you acknowledge that you placed the order and that Kai Shuai provided – that made the tooling?
A: Uh-huh (affirmative).
Q: And that the amount is acceptable?
A: Yes.
Q: So the dispute arises from the fact that you think that TruAudio should pay for it instead of Templeton Group?
A: No.  The dispute that I think that we have – does this get me into legal stuff?
MR. LEE (Counsel for Mr. Swan): Go ahead.
THE WITNESS (Mr. Swan): The dispute that we have with Kai Shuai is that Kai Shuai interfered with international business, colluded with people, competitors of ours, if you will, to material – well, materially and financially do harm to our company.
Q: A. How did they interfere?
A: They provided pricing, our confidential pricing, to a third party, which in turn was provided to TruAudio, in one instance.[42]

---

[41]*Id.* Ex. C.

[42]Docket No. 70 Ex. 1, at 116-17.

2.      *Breach of Contract*

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[43]

Templeton does not dispute that it entered into valid purchase orders for product or tooling with Kai Shuai.  Nor does Templeton dispute that Kai Shuai built the products and tooling, or that Kai Shuai shipped the products.  Although Templeton argues that it should not be liable for any products shipped after the cancellation of its purchase orders, there is no evidence to suggest that Kai Shuai has brought any claims before the Court for any such products. Templeton does not dispute the amounts that were invoiced for the tooling or products, or that payment is past due.  Instead, Templeton argues that it is not liable for its contractual obligations because Kai Shuai breached the contracts first, because Kai Shuai's claim is barred by the doctrine of unclean hands, or because TruAudio is solely liable to Kai Shuai for these purchase orders.

Templeton's prior breach and unclean hands arguments are both based on the fact that Kai Shuai disclosed the prices it was charging for TruAudio's products and solicited business with TruAudio directly.  Although Templeton claims that this was a breach of contract, it can point to no contractual provision that was breached.  Instead, it argues that the pricing

---

[43]*Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 391 (Utah 2001) (citing *Nuttall v. Berntson*, 30 P.2d 738, 741 (Utah 1934)).

information was confidential, and that an implied contract was created because of that confidentiality.

Even if Templeton were able to show that Kai Shuai had breached these alleged implied contracts, this would not provide a defense for its breach of an entirely distinct contract that Kai Shuai fully performed.[44]  Any breach that Kai Shuai may have committed by disclosing the pricing information would have the consequence of preventing future purchase orders.  However, this would not change the validity of purchase orders already issued, alter the terms under such purchase orders, or hinder Templeton's ability to perform under those purchase orders.  While Templeton may be entitled to damages against Kai Shuai if it were able to demonstrate that other contracts existed and that they were breached, this has no bearing on the contracts under consideration here.  As damages are an adequate remedy for a breach of contract of this type, the Court need not consider equitable remedies or Templeton's equitable unclean hands defense.

Templeton's argument that TruAudio should be solely liable for these contracts does have some equitable appeal.  However, this argument finds no support in the relevant contractual agreements.  The purchase orders under consideration were submitted by Templeton, and fulfilled according to Templeton's terms.  It may be true that Templeton was merely passing on purchase orders it received from TruAudio.  That does not change the fact that Templeton was the party that contracted with Kai Shuai, or that Templeton is the party responsible under the

---

[44]*See Murphy Oil USA, Inc. V. Wood*, 438 F.3d 1008, 1024 (10th Cir. 2006) ("'Under the [first breach] rule stated in [§ 237], only duties with respect to the performances to be exchanged under the particular exchange of promises are affected by a failure of one of those performances. A duty under a separate contract is not affected.'" ) (quoting Restatement (Second) of Contracts § 237 cmt. e).

15

contracts.  To the extent that TruAudio has not paid Templeton for the fulfillment of these contracts, it may seek payment from TruAudio.

Therefore, the Court will deny Templeton's Motion and grant Kai Shuai's Motion on its contractual claim and award Kai Shuai damages in the amount of $79,514.72, together with interest from the time payment was due under the contracts.

B.      TEMPLETON'S BREACH OF CONTRACT CLAIM

TruAudio argues that Templeton's breach of contract claim must fail because there is no contract to be breached.  "Generally, formation of a contract requires an offer, an acceptance, and consideration."[45]  "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous."[46]  "'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'"[47]  "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made."[48] "An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer."[49]

---

[45]*Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012) (citing *Golden Key Realty, Inc. v. Mantas*. 699 P.2d 730, 732 (Utah 1985)).

[46]*DCM Inv. Corp. v. Pinecrest Inv. Co.*, 34 P.3d 785, 789 (Utah 2001).

[47]*Cea*, 276 P.3d at 1185 (quoting Restatement (Second) of Contracts § 33).

[48]*Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995) (citing *Eng'g Assocs., Inc. v. Irving Place Assocs., Inc.*, 622 P.2d 784, 787 (Utah 1980)).

[49]*Id.*

Templeton's breach of contract claim is based on several different alleged contracts. First, Templeton alleged that TruAudio breached its contractual obligation to pay Templeton for several orders that TruAudio made and Templeton fulfilled.  Second, Templeton alleged that there is an overarching agreement requiring TruAudio to make its purchases through Templeton for any products that Templeton helped bring into mass production.  These allegations will be considered in turn below.

### 1. Individual Orders

TruAudio does not dispute that the purchase orders it submitted to Templeton constitute contracts.  Nor does TruAudio argue that a contract cannot be formed through an email without a purchase order.  Instead, TruAudio argues that Templeton "has not pointed to any e-mail that constitutes a contract,"[50] and justifies its nonpayment on some orders because Chinese factories are also requesting payment for those orders.  Furthermore, TruAudio argues that, even if the Court does find that contracts exist between Templeton and TruAudio, there could have been no breach because TruAudio's only obligation would be to provide payment, and it is currently seeking to fulfill that obligation by obtaining a declaratory judgment in this case.

 Templeton has supplied the Court with emails and memoranda regarding the production of tooling for TruAudio's "Revolve" and "Ghost" series of products.  Included in these emails and memoranda are discussions between TruAudio and Templeton regarding the design specifications, modifications, pricing and payment terms, status updates on the development of

---

[50]Docket No. 57, at 11.

17

the tooling, and receipt of samples produced by the tooling.[51]  TruAudio has provided no

authority supporting its assertion that a request for payment from a third party excuses

TruAudio's obligations to Templeton, even though Templeton has fulfilled its obligations and

has not assigned its right to payment.

Considering the evidence in the light most favorable to Templeton, material issues of fact

exist regarding whether TruAudio and Templeton contracted for the order of products and

tooling.  Therefore, the Court will deny TruAudio's Motion for Summary Judgment on

Templeton's breach of contract claims insofar as those claims relate to specific orders of product

or tooling.

2.      *Overarching Agreement*

Templeton also claims that there is an overarching agreement with TruAudio governing

the products that Templeton has helped TruAudio develop.  Under this alleged agreement,

TruAudio would be required to order all of these products through Templeton until TruAudio

"sunsets" (discontinues) the product line.  Templeton alleges that TruAudio has breached that

agreement by ordering its products directly from the Chinese factories.  Templeton acknowledges

that this agreement has not been formalized in any one document.  Instead, it argues that this

understanding is consistent with standard industry practice and the parties' prior business

dealings and communication.

Although the parties ardently dispute the value of the services that Templeton performed

for TruAudio, there does not appear to be any dispute about either the fact that Templeton did

---

[51]*See* Docket No. 69 Exs. 24-32, 36-44, 47-48, 52-57, 63-67.

perform work or the manner in which it expected payment.  Templeton only received payment

from TruAudio through the markup it added to purchase orders it received from TruAudio.  If a

product line did not go into mass production, Templeton did not get paid, regardless of the

amount of work it performed to help develop the product line.

However, Templeton has provided no evidence that TruAudio was contractually

prohibited from purchasing its products from the Chinese factories or other vendors.  Templeton

merely states that this was understood and according to common industry practice.  This

argument is belied by the fact that TruAudio was allowed to switch from ATI to Templeton

without any form of compensation to ATI.  In fact, Lou Melillo, owner of ATI, testified that

when he did business with TruAudio, there was nothing to prevent TruAudio from taking its

business for a specific product to a new supplier, unless there was a "firm, hard contract,"[52] or in

other words, "a contract that says that – that product is going to be delivered exclusively . . . by

that company to TruAudio."[53]

Nor can the Court find any evidence from which a jury could determine there was an

agreement as to other key terms of such a contract, such as the price to be paid by TruAudio to

Templeton.  Indeed, Templeton seems to argue that TruAudio had no right to know how much

Templeton was being paid.  All evidence of negotiation that was presented to the Court is of

negotiations with the Chinese factories.  Mr. Swan claims that he never told TruAudio how much

---

[52]Docket No. 67 Ex. A, at 20.

[53]*Id.*

he was marking up the products he was supplying.[54]  Without a contractual provision either

specifying this amount or specifying a remedy for a breach, the parties have no way of knowing

how damages for such a breach would be calculated or even if damages would be available at all.

Templeton has not provided the necessary evidence of the key terms of an overarching

agreement from which a jury could determine that such a contracts exists.[55]  Therefore the Court

will grant TruAudio's Motion for Summary Judgment insofar as it relates to Templeton's claim

that TruAudio was contractually bound to order products exclusively through Templeton for any

products that Templeton helped develop.

C.      *QUANTUM MERUIT*

TruAudio also seeks summary judgment on Templeton's claims for recovery under

theories of *quantum meruit*, and Templeton seeks summary judgment on its claim for unjust

enrichment.  Templeton argues that even if the Court finds that there was no overarching contract

governing its relationship with TruAudio, it is still entitled to relief for breach of a contract

implied in fact, for breach of a contract implied in law, and under a theory of unjust enrichment.

Utah courts have "identified two branches of quantum meruit: (1) contracts implied in law, also

known as quasi-contracts or unjust enrichment, which are not actions to enforce a contract but

are actually actions to require restitution; and (2) contracts implied in fact, which are contracts

---

[54]Docket No. 67 Ex. H, at 118.

[55]TruAudio also argues that any such agreement would be barred by the statute of frauds.
As the Court has already found that no contract exists, it will not address this argument.

established by conduct."[56]  Under Utah law, the theory of unjust enrichment is synonymous with

the theory of a contract implied in law,[57] and the Court will consider those claims together.

    *1.    Contract Implied in Fact*

    "The elements of an implied-in-fact contract are: (1) the defendant requested the plaintiff

to perform work; (2) the plaintiff expected the defendant to compensate him or her for those

services; and (3) the defendant knew or should have known that the plaintiff expected

compensation."[58]  "An implied in fact contract differs from an express contract only in mode of

expression."[59]  A contract implied in fact requires "a manifestation of mutual assent, by words or

actions or both, which reasonably are interpretable as indicating an intention to make a bargain

with certain terms or terms which reasonably may be made certain."[60]  "Because the existence of

an implied contract is normally a question of fact which turns on the objective manifestations of

the parties' intent, it is primarily a jury question."[61]  "However, the court retains the power to

---

[56]*Knight v. Post*, 748 P.2d 1097, 1100 (Utah Ct. App. 1988).

[57]*Emergency Physicians Integrated Care v. Salt Lake Cnty.*, 167 P.3d 1080, 1083 (Utah 2007).

[58]*Davies v. Olson*, 746 P.2d 264, 269 (Utah Ct. App. 1987).

[59]*Fowler v. Taylor*, 554 P.2d 205, 208 (Utah 1976).

[60]*Id.* (quoting *Rasmussen v. U.S. Steel Co.*, 265 P.2d 1002, 1004 (Utah 1954)); *see Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991) ("Therefore, for an implied-in-fact contract term to exist, it must meet the requirements for an offer of a unilateral contract.  There must be a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision.").

[61]*Cabaness v. Thomas*, 232 P.3d 486, 503 (Utah 2010) (internal quotations and citations omitted).

decide whether, as a matter of law, a reasonable jury could find that an implied contract exists."[62]

Through this claim, Templeton is asking the Court to find that there is a contract implied in fact with terms requiring TruAudio to use Templeton as its exclusive provider of any products that Templeton helped TruAudio develop.  The parties do not dispute that TruAudio asked Templeton to perform services to help TruAudio develop new products lines.  However, the parties dispute whether TruAudio knew or should have known that Templeton expected compensation for those services.

The undisputed facts are that Templeton was paid only through a markup on the products TruAudio ordered through it.  There is no evidence that Templeton was ever paid directly for design or development services.  In fact, it is undisputed that Templeton was not paid for these services through any means when a product did not go into mass production, regardless of the amount of work performed by Templeton.  Furthermore, both parties were aware that TruAudio was not required to order products through ATI that ATI helped develop, or to compensate ATI in any way when TruAudio switched to using Templeton as its vendor.

Therefore, the Court finds that Templeton has not presented sufficient evidence for a jury to find that a contract implied in fact exists, and will grant TruAudio's Motion for Summary Judgment on this claim.

2.    *Contract Implied in Law*

"The doctrine of unjust enrichment is designed to provide an equitable remedy where one does not exist at law.  Therefore, where an express contract covering the subject matter of the

---

[62]*Id.* (internal quotations and citations omitted).

litigation exists, recovery for unjust enrichment is not available."[63]   To prevail under its claim for

a contract implied in law, or unjust enrichment, Templeton must demonstrate that (1) it conferred

a benefit on TruAudio; (2) TruAudio was aware of the benefit; and (3) TruAudio retained the

benefit under such circumstances as to make it inequitable for TruAudio to retain the benefit

without payment of its value.[64]   "The measure of recovery under quasi-contract, or contract

implied in law, is the value of the benefit conferred on the defendant (the defendant's gain) and

not the detriment incurred by the plaintiff."[65]

The only contractual agreements that the parties have presented to the Court are contracts

for the purchase of products or tooling.  The parties did not have an agreement covering the

overall relationship between the parties, or covering any services that Templeton provided to

TruAudio in helping to design or develop products.  Thus, Templeton has no contract-based

remedies under which it can pursue payment for those services.

Although the parties dispute the amount and value of the product development services

performed by Templeton, they do not dispute that TruAudio received a benefit from those

services and had knowledge of that benefit.  The parties do, however, dispute whether or not it

would be inequitable for TruAudio to retain the benefit without paying for it.  Templeton has

provided the Court with evidence of numerous emails containing requests from TruAudio for

Templeton to perform design and development work on TruAudio's product lines.  TruAudio

---

[63]*Selvig v. Blockbuster Enters.*, 266 P.3d 691, 698 (Utah 2011) (internal quotations and citations omitted).

[64]*Knight*, 748 P.2d at 1100; *Davies*, 746 P.2d at 269.

[65]*Davies*, 746 P.2d at 269.

cannot dispute that Templeton performed this work at TruAudio's request with the expectation of doing future business with TruAudio.

TruAudio makes several arguments for why it would not be inequitable for it to receive the benefits of Templeton's work without payment.  First, it argues that "[a]bsent a contract, [Templeton] could not reasonably expect compensation for anything more than the products actually ordered."[66]  Second, TruAudio argues that it terminated the relationship in order to save costs.  Third, TruAudio argues that Templeton was adequately compensated for its services or is otherwise barred from further recovery by the doctrine of unclean hands because it charged a higher-than-15% markup on the products provided to TruAudio.[67]

TruAudio's first two arguments miss the point.  It is not unreasonable for Templeton to expect compensation for the services it provided.  It may have failed to record this expectation in a contract, but that is precisely the situation a contract implied in law is meant to remedy.  Likewise, the fact that TruAudio stopped doing business with Templeton to save costs is irrelevant to whether it would be inequitable to allow TruAudio to not pay Templeton for work it had already performed.

TruAudio's third argument is a closer issue.  Templeton has argued that the way it received compensation for its design services was through its markup.  Therefore, Templeton has received some compensation for every product line that it has filled purchase orders on.  The

---

[66]Docket No. 57, at 14.

[67]TruAudio actually argues that Templeton had a greater-than-15% *profit margin* on these products.  However, the only evidence presented to the Court has been on Templeton's markup, not its profit margin, which would require knowledge of Templeton's expenses.

question of whether the compensation Templeton has received is equal to the value of the benefit conferred upon TruAudio is a question of fact to be determined by the jury.  Likewise, the issue of whether Mr. Swan misrepresented his markup to TruAudio is a question that must be resolved by the jury.

Therefore, the Court will deny both parties' Motions for Summary Judgment on Templeton's contract implied in law claim.

D.     IMPLIED COVENANT OF GOOD FAITH

TruAudio moves the Court for summary judgment on Templeton's claim for breach of the covenant of good faith and fair dealing.  "In Utah, virtually every contract imposes upon each party a duty of good faith and fair dealing, the violation of which gives rise to a claim for breach of contract."[68]  "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."[69]  However, "to find a breach of the duty of good faith and fair dealing, there must be some type of preexisting contractual relationship."[70]

Templeton's claim for violation of the implied covenant of good faith and fair dealing rests on the premise that "the parties agreed that Templeton Group would be the sole supplier of products TruAudio chose to sell that resulted from Templeton Group's design or development

---

[68]*Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1239 (Utah 2004) (citing *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199-200 (Utah 1991)).

[69]*St. Benedict's Dev. Co.*, 811 P.2d at 199 (citing *Bastian v. Cedar Hills Inv. & Land Co.*, 632 P.2d 818, 821 (Utah 1981); *Ferris v. Jennings*, 595 P.2d 857 (Utah 1979)).

[70]*Andreini v. Hultgren*, 860 P.2d 916, 921 (Utah 1993).

efforts."[71]  However, as noted above, no such contractual relationship existed.  Without a contractual basis for Templeton's expectations, Templeton cannot show that TruAudio's decision to terminate Templeton as its supplier deprives Templeton of its right to receive the fruits of any contract.

Therefore, the Court will grant TruAudio's Motion for Summary Judgment on Templeton's claim for breach of the implied covenant of good faith and fair dealing.

E.      INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

The various complaints and counterclaims filed by the parties in this consolidated action contain several causes of action for Intentional Interference with Economic Relations. Templeton requests summary judgment on its claim against Kai Shuai and TruAudio's claim against it.  Likewise, TruAudio requests summary judgment on Templeton's claim against it. These claims will be considered separately below.

1.      *Templeton's Claim Against Kai Shuai*

a.      *Choice of Law*

Templeton argues that California's law for intentional interference with prospective economic advantage governs its claims against Kai Shuai.  Kai Shuai does not dispute this point, and simply argues that it should prevail under either California or Utah law.

---

[71]Docket No. 24, at 8.

"A federal court sitting in diversity must apply the conflicts of law rules of the state in which it sits.  This includes applying the state choice of law rules."[72]  "In Utah we apply the 'most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance."[73]  Utah courts consider the following factors when determining which state has the most significant relationship to a tort dispute:  "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[74]

Templeton's claim is that Kai Shuai's disclosure of its allegedly confidential pricing information to ODM was the ultimate cause of TruAudio's decision to stop doing business with Templeton.  Templeton's principal place of business is in California, while Kai Shuai is a Taiwan corporation doing business in China.  The price list was disclosed to ODM, a California company, and the brunt of the alleged harm occurred to Templeton.  The relationship between Templeton and Kai Shuai is centered in either China or California.  The only connection to Utah that this tort claim involves is the fact that TruAudio, a Utah company, is the company that stopped doing business with Templeton, allegedly as a result of the disclosure.

---

[72]*Tucker v. R.A. Hanson Co., Inc.*, 956 F.2d 215, 217 (10th Cir. 1992) (internal citations omitted).

[73]*Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002).

[74]*Id.* at 1060 (quoting Restatement (Second) Conflict of Laws § 145(2) (1971)).

Taking into consideration all of these factors, the Court finds that California is the state with the most significant relationship to this tort claim.

        b.      *Intentional Interference with Prospective Economic Advantage*

In California, the elements of intentional interference with prospective economic advantage are stated as follows:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.[75]

"[T]he third element of the tort of interference with prospective economic advantage 'also requires a plaintiff to plead intentional wrongful acts on the part of the defendant designed to disrupt the relationship.'"[76]  A plaintiff must "prove . . . that the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself.'"[77]  "The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct."[78]

---

[75]*Marsh v. Anesthesia Serv. Med. Grp., Inc.*, 132 Cal. Rptr. 3d 660, 680 (Cal. Ct. App. 2011).

[76]*Id.* (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950-51 (Cal. 2003)).

[77]*Korea Supply Co.*, 63 P.3d at 950 (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995)).

[78]*Id.* at 953.

"[T]herefore . . . an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."[79]

Under this third element, Templeton must show that Kai Shuai's disclosure of the price list to ODM was wrongful by a legal standard other than the mere fact that it interfered with prospective economic relationships.  Kai Shuai claims that, at the time of the disclosure, it was under the impression that TruAudio had already decided to use a supplier other than Templeton.[80]  Likewise, TruAudio's CEO, Mr. Davies, testified that TruAudio had made the decision to terminate its relationship with Templeton prior to receiving the price list.[81]  It is not immediately apparent by what independent legal standard Kai Shuai's act of telling a potential vendor the prices it charges for a product is wrongful.

Templeton appears to argue either that Kai Shuai was contractually obligated to sell TruAudio products through Templeton, or that there is, as a matter of law, an implied contract not to disclose confidential information to a third party.  Even if the Court were to assume the disputed fact that the price list was confidential, Templeton's argument fails under either of these contractual theories.

"California law does not recognize a breach of contract as a 'wrongful act' predicate required for this claim."[82]  "[A] breach of contract claim cannot be transmuted into tort liability

---

[79]*Id.* at 954.

[80]Docket No. 55 Ex. 2, at 12-13.

[81]Docket No. 67 Ex. B, at 15.

[82]*Block v. eBay, Inc.*, 2012 WL 1601471, at *5 (N.D. Cal. May 7, 2012) (citing *JRS Prods., Inc. v. Matsushita Elec. Corp. of Am.*, 8 Cal. Rptr. 3d 840, 852 (Cal. Ct. App. 2004)).

by claiming that the breach interfered with the promisee's business."[83]  This is true even when a party breaches in order to put the non-breaching party out of business and rid itself of a competitor.[84]  "[M]otive, regardless of how malevolent, remains irrelevant to a breach of contract claim and does not convert a contract action into a tort claim . . . ."[85]  To the extent that Templeton is alleging a breach of contract, it must pursue this claim under that theory.

Even if Templeton had alleged an independent legal standard under which Kai Shuai's actions could be deemed wrongful, summary judgment would still not be appropriate on this claim.  As discussed above, Kai Shuai has presented testimony that it had been told TruAudio was seeking a new vendor prior to disclosing the price list.  This testimony is corroborated by the testimony of Mr. Davies.  Although Templeton disputes this evidence, this still creates a material issue of fact regarding the fourth and fifth elements of the California test.  Therefore, the Court will deny Templeton's Motion for Summary Judgment on this claim.

2.      *TruAudio's Claim Against Templeton*

Templeton and TruAudio analyze TruAudio's claim for intentional interference with economic relations under both Utah and California law, without briefing the Court on which law should apply.  "When faced with a choice of law question, Utah courts first consider whether the laws of another jurisdiction and local law would reach a different result."[86]  Both Utah and

---

[83]*JRS Prods., Inc.*, 8 Cal. Rptr. 3d at 852.

[84]*Id.* at 852.

[85]*Id.*

[86]*Metro Aviation, Inc. v. United States*, 2012 WL 2914521, at *1 (D. Utah July 16, 2012).

California require a plaintiff to show that the intentional acts of the defendant were either wrongful or improper.  TruAudio has failed to provide sufficient evidence to meet either standard.

Under Utah law, TruAudio must provide evidence that Templeton's alleged intentional interference was "for an improper purpose or by improper means."[87]  "The alternative of improper purpose will be satisfied where it can be shown that the actor's predominant purpose was to injure the plaintiff."[88]  "The alternative requirement of improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules."[89]  "Improper means include . . . deceit or misrepresentation, . . . defamation, or disparaging falsehood."[90]

Similarly, as discussed earlier, under California law "[t]he tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct."[91]

In its complaint, TruAudio alleges two wrongful acts sufficient to meet these standards. First, TruAudio alleges that Templeton asserted ownership rights in TruAudio's property,

---

[87] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

[88] *Id.* at 307-08.

[89] *Id.* at 308.

[90] *St. Benedict's Dev. Co.*, 811 P.2d at 201.

[91] *Korea Supply Co.*, 63 P.3d at 953.

causing the factories to place TruAudio's designs into open tooling. However, the undisputed evidence in this case is that the decision to place some of TruAudio's tooling in the open tooling category was based on the fact that Kai Shuai had not received payment for the tooling from either Templeton or TruAudio, and therefore considered itself to be the owner of the tooling. TruAudio has presented no evidence to the Court that the placement into open tooling was based on a deliberate misrepresentation by Templeton as to ownership rights.

Second, TruAudio alleges that Templeton misrepresented the amount it was owed by TruAudio in order to prevent the Chinese factories from dealing with TruAudio. TruAudio has failed to present evidence of either a deliberate misrepresentation or an improper purpose in making the representation. Much of the substance of this case is based on an honest disagreement over how much TruAudio owes Templeton. TruAudio admits that it does owe Templeton for services performed, and cannot claim that Templeton was misrepresenting the fact that it had not been paid all that was due. The fact that TruAudio does not agree on the amounts does not make Templeton's assertions deceitful.

TruAudio does not argue this point in its briefing. Instead, it argues that since it has presented evidence that Templeton told Kai Shuai that TruAudio did not pay its bills, it has created a material issue of fact as to whether these statements were made to harm TruAudio. Although the Court must interpret facts in the light most favorable to the non-moving party, TruAudio must at least provide some evidence to support its claim that the statements were deceitful or made for an improper purpose. Instead of presenting evidence, TruAudio asks the

Court: "How could [Templeton] expect to recover money from TruAudio by telling Kai Shuai that TruAudio does not pay its bills?"[92]

The answer seems straightforward.  As TruAudio had not paid its bills, Templeton was hoping that TruAudio would be forced to pay its bills to Templeton before Kai Shuai would do business with it, or that TruAudio would be forced to continue doing business through Templeton.  These reasons are not indicative of a predominate purpose of harming TruAudio as the standards require, but instead indicate that Templeton was seeking to obtain payment it felt it was owed for its own services.

As TruAudio has not presented evidence to support the wrongful or improper acts requirements for intentional interference with economic relations, the Court will grant Templeton's Motion for Summary Judgment on this claim.

    *3.      Templeton's Claim Against TruAudio.*

Templeton alleges that TruAudio interfered with Templeton's economic relations with the Chinese factories by doing business with the Chinese factories directly instead of through Templeton.  Again, the parties analyze this claim under both Utah and California law without briefing the Court on which law should apply.  Both Utah and California require a plaintiff to show that the intentional acts of the defendant were either wrongful or improper.[93]  Templeton has failed to provide sufficient evidence to meet either standard.

_____

[92]Docket No. 67, at 36.

[93]*See Leigh Furniture & Carpet Co.*, 657 P.2d at 304 (noting that under Utah law, the interference must be "for an improper purpose or by improper means." ); *Korea Supply Co.*, 63 P.3d at 950-51(California law "requires a plaintiff to plead intentional wrongful acts" ).

As discussed above, TruAudio would be acting with an improper purpose if its predominant reason for doing business with the Chinese factories was to injure Templeton. Templeton has presented no evidence that TruAudio's purpose was anything other than an attempt to save costs.

Improper means, on the other hand, "is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules."[94]  Means can also be "improper or wrongful because they violate 'an established standard of a trade or profession.'"[95]  Templeton argues that TruAudio acted through an improper means because working directly with the Chinese factories was in violation of the established industry standard that a vendor who helps with the design of certain products would be entitled to exclusive rights to have those products purchased through it.

Templeton has provided the Court with no evidence of this standard other than its claim that this standard exists.  As noted earlier, there is evidence that TruAudio was allowed to switch from ATI to Templeton without any form of compensation to ATI, and there was no contract requiring TruAudio to purchase product exclusively through Templeton.  Therefore, Templeton has failed to provide sufficient evidence from which a jury could find that TruAudio's actions were in violation of an established industry standard.

---

[94]*Leigh Furniture & Carpet Co*, 657 P.2d at 308.

[95]*Id.* (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 (Or. 1978)).

Templeton also argues that TruAudio acted through an improper means because its actions were in violation of the common law of unjust enrichment.  However, even if the Court were to find that Templeton was entitled to payment under the law of unjust enrichment, it would be because TruAudio had failed to compensate Templeton for its previously rendered services, not because TruAudio did business directly with Chinese factories.

Therefore, the Court will grant TruAudio's Motion for Summary Judgment on Templeton's claim for intentional interference with economic relations.

F.      UNFAIR COMPETITION AND CONSPIRACY

Templeton alleges that TruAudio engaged in unfair competition and conspiracy to commit unfair competition by using ODM to obtain Templeton's confidential price list from Kai Shuai.  Liability for unfair competition can rest on the misappropriation of confidential business information through deceptive means.[96]

The evidence before the Court is that TruAudio decided to evaluate the possibility of working directly with Kai Shuai or purchasing its products from a vendor other than Templeton. In doing so, it requested a quote from ODM, who in turn requested a quote from Kai Shuai.  Kai Shuai then provided ODM with the amounts that Kai Shuai would charge to produce TruAudio's products, without the amount of Templeton's markup.  This information was then conveyed to TruAudio, which decided to terminate its relationship with Templeton.  The argument that TruAudio's actions constitute unfair competition rests on the two premises that (1) Kai Shuai

---

[96]*Am. Airlines, Inc. v. Platinum Worlds Travel*, 769 F. Supp. 1203, 1207 (D. Utah 1990), *aff'd sub nom Am. Airlines v. Christensen*, 967 F.2d 410 (10th Cir. 1992) (citing *Dubuque Prod. Inc. v. Lemco Corp.*, 227 F. Supp. 108 (D. Utah 1963)).

was not allowed to sell TruAudio products through anyone but Templeton, and (2) that the amount Kai Shuai charged for TruAudio products was confidential from TruAudio.

There is no evidence before the Court that Kai Shuai was contractually obligated to only sell TruAudio products through Templeton.  Nor was TruAudio contractually obligated to purchase those products through Templeton.  TruAudio's actions in requesting pricing information are neither deceptive nor unfair.  Absent a contractual obligation, there is no basis for a finding that a request to obtain quotes from alternative vendors constitutes unfair competition.  Templeton may argue that it could not compete with other vendors because it incurred costs in the development of TruAudio's products.  However, to the extent that TruAudio is seeking payment for past services, it must do so through its claim for a contract implied in law relating to those services.

Therefore, the Court will grant TruAudio's Motion for Summary Judgment on Templeton's unfair competition and conspiracy to commit unfair competition claims.

G.    CONVERSION

"'A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession.'"[97]  "Thus, a party alleging conversion must show that he or she is entitled to immediate possession of the property at the time of the alleged conversion."[98]  "Utah would not allow a conversion claim for

---

[97]*Fibro Trust, Inc. v. Brahman Fin., Inc.*, 974 P.2d 288, 295-96 (Utah 1999) (quoting *Allred v. Hinkley*, 328 P.2d 726, 728 (1958)).

[98]*Id.* at 296.

intangible intellectual property."[99]  In addition, a claim for conversion "is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information."[100]

     *1.*    *Templeton's Claim Against TruAudio.*

Templeton has brought a claim for conversion against TruAudio, alleging that TruAudio has converted intellectual property that Templeton contributed to TruAudio's products because Templeton was not compensated for the use of its designs and concepts.  The exact nature of the property interest asserted by Templeton is not clear.  To the extent it is an assertion of a property interest in the ideas and concepts that were used to develop the products, it is a claim for conversion of intangible intellectual property, which is not allowed under Utah law.  To the extent it is a claim that the designs and concepts used to develop the property are trade secrets or confidential, this claim is preempted under Utah law.

To the extent that Templeton is asserting a property interest in the actual tooling or products developed using that tooling, Templeton must show that it was entitled to immediate possession of the property at the time of conversion.  Templeton alleges that TruAudio "converted that intellectual property for its own gain and use and refuses to compensate Templeton for it."[101]

---

[99]*Margae, Inc. v. Clear Link Technologies, LLC*, 620 F. Supp. 2d 1284, 1287 (D. Utah 2009).

[100]*CDC Restoration & Const., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 331 (Utah 2012).

[101]Docket No. 24.

The Templeton design work was performed specifically for TruAudio, and Templeton itself submitted the designs to the Chinese factories.  Mr. Swan testified in his deposition that the tooling was owned by the entity that paid for it.[102]  He also testified that normally TruAudio would pay for this tooling, and in cases where both parties made contributions, if ever, TruAudio owned the tooling.[103]  There is no evidence before the Court that Templeton has paid for any tooling that TruAudio did not purchase from it.  Instead, the Chinese factories appear to be treating TruAudio as the owner of its tooling.  Nor was there any contractual obligation for TruAudio to pay Templeton for this design work, as Templeton was contractually compensated only for products that TruAudio actually ordered from Templeton.

Therefore, Templeton must be alleging that a conversion of this property occurred at the time that TruAudio chose to switch suppliers, thereby depriving Templeton of the compensation that it expected from future purchase orders.  However, there is no evidence before the Court that Templeton had any right to possession of the tooling or products developed from the tooling at that time.

Therefore, the Court will grant TruAudio's Motion for Summary Judgment on Templeton's claim for conversion.

---

[102]Docket No. 57 Ex. D, at 35.

[103]*Id.* at 77-78.

2.      *TruAudio's Claim against Templton.*

TruAudio claims that Templeton "attempted to convert intellectual property owned by TruAudio to [Templeton's] own use and benefit."[104]  TruAudio alleges that Templeton was attempting to do this by informing the Chinese factories that Templeton was the owner of some of TruAudio's intellectual property.  However, TruAudio has not shown any evidence of actual conversion.  "TruAudio does not dispute that a portion of its conversion claim, arising from the theft of intellectual property, was in fact based on attempted conversion."[105]

Although not included in its complaint, in its briefing TruAudio alleges that it is actually claiming "conversion related to [Templeton's] markup in excess of its representation."[106]  Even if the Court assumes that TruAudio has adequately pleaded this claim, it has not alleged sufficient facts for a reasonable trier of fact to find a conversion.  Templeton's possession of the money in excess of a 15% markup was not achieved without lawful justification, as the money was received pursuant to the terms of a purchase contract.  The evidence before the Court is that TruAudio would order products from Templeton at an agreed upon price.  Templeton then lived up to its end of the bargain and provided those products to TruAudio at the price agreed upon. The fact that TruAudio was unaware of exactly how much of the price was going to Templeton is irrelevant.  If it had wished to contractually set this amount, it could have done so.  The Court

---

[104]Docket No. 1, at 6.

[105]Docket No. 67, at 37.

[106]*Id.*

39

can find no evidence of any contractual term stating that Templeton was only entitled to a 15%

markup, and TruAudio has not brought claims for breach of contract or fraud.

Therefore, the Court will grant Templeton's Motion for Summary Judgment on

TruAudio's claim for conversion.

H.    WRONGFUL USE OF CIVIL PROCEEDINGS

TruAudio has moved for summary judgment on Templeton's claim for wrongful use of

civil proceedings.  Templeton has not opposed this motion.  In order to prove its claim,

Templeton must show that TruAudio brought its claims "without probable cause and primarily

for a purpose other than that of securing the proper adjudication of the . . . claim[s]."[107]  As

Templeton has not brought forward any evidence that TruAudio brought suit against it for any

purpose other than the proper adjudication of its claims, Templeton's claim must fail.  Therefore,

the Court will grant TruAudio's Motion for Summary Judgment on Templeton's claim for

wrongful use of civil proceedings.

## IV.  CONCLUSION

It is therefore

ORDERED that Kai Shuai's Motion for Summary Judgment (Docket No. 51) is

GRANTED IN PART AND DENIED IN PART.  It is further

ORDERED that Templeton's Motion for Partial Summary Judgment (Docket No. 53) is

GRANTED IN PART AND DENIED IN PART.  It is further

---

[107]*Gilbert v. Ince*, 981 P.2d 841, 846 (Utah 1999) (quoting Restatement (Second) of Torts § 674).

ORDERED that TruAudio's Motion for Summary Judgment (Docket No. 56) is

GRANTED IN PART AND DENIED IN PART.  This matter will proceed to trial on the parties'

remaining claims, pursuant to the terms of this Order.

DATED   March 8, 2013.

BY THE COURT:

_____
TED STEWART
United States District Judge